ON APPLICATION FOR REHEARING
This court's opinion of October 20, 1995, is hereby withdrawn and the following opinion is substituted therefor.
This case was originally assigned to another judge on the Alabama Court of Criminal Appeals. It was reassigned to Judge Cobb on January 17, 1995.
On August 30, 1985, Tommy Hamilton was convicted of the robbery-murder of Lehman Woods and was sentenced to death. His case is before this court on appeal from the lower court's judgment granting in part and denying in part the petitioner's Rule 20, Ala.R.Crim.P.Temp. (now Rule 32, Ala.R.Crim.P.), petition for post-conviction relief. In a 68-page opinion, the judge who presided over the Rule 32 hearing found, among other things, that the testimony of a principal witness for the State, Jimmy Dale Owens, a trusty in the jail where the petitioner had been incarcerated before trial, was perjured. The lower court also found that the State had violated the United States Supreme Court's ruling in Brady v. Maryland,373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing to defense counsel certain exculpatory *Page 1256 
evidence, namely, evidence that state investigators had promised Owens help in procuring an early release if he testified against Hamilton. These appeals ensued.
William Eddie Oliver, a trusty and cellmate of Owens's, testified at the Rule 32 hearing. Oliver exposed Owens's testimony as perjured testimony. The trial court found that this perjured testimony, which depicted the petitioner's remorselessness and the viciousness of the crime, influenced the jury's recommendation of the death sentence for Hamilton.
The sentencing judge who presided at the original trial was also a witness at the Rule 32 hearing. The sentencing judge testified that, in retrospect, if the petitioner had been tried after his codefendant's/sister's trial (she received a manslaughter conviction and a 10-year sentence) he would not have sentenced the petitioner to death even if the jury had recommended the death penalty. The major difference between the petitioner's trial and his sister's trial was the fact that Jimmy Dale Owens did not testify at the petitioner's sister's trial.
In his extensive opinion and order, the trial court found that the perjured testimony did not affect the guilt phase of the trial, but that it affected only the sentencing phase. As he stated in his March 25, 1994, opinion:
 "[T]he . . . issue is whether there is a significant chance that had the jury heard the truth, it would have reached a different result. There is no significant chance that the jury would have reached a different verdict with regard to the capital offense. The truthful portions of Owens' testimony were corroborated and were proved by the rest of the State's case. . . . Owens' testimony bolstered the defense that the taking of the money was a spontaneous event after the murder when the money fell out of the victim's pocket. Therefore, there is no significant chance that the perjured testimony affected the verdict of guilt."
(C. 1584-85.)
As a result of this finding, the judge granted the petitioner a new sentencing hearing but denied the motion for a new trial. Both the State and the petitioner appealed from this ruling. The State appeals from that part of the order granting a new sentencing hearing, and the petitioner appeals from that part of the order denying a new trial on the merits.
 I A
The primary issue before this court is whether the court finding that the State's witness, Owens, perjured himself during his testimony against the petitioner was proper. In order to reverse the trial court's finding that the testimony was perjury, this court must find that that finding was clearly erroneous and palpably wrong. Anderson v. City of BessemerCity, N.C., 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518
(1985); Morrison v. State, 551 So.2d 435 (Ala.Crim.App. 1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1938, 109 L.Ed.2d 301
(1990); Thompson v. Hartford Accident Indem. Co.,460 So.2d 1264 (Ala. 1984). "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Morrison, 551 So.2d at 436-37 (citing United States v. United States GypsumCo., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). Seealso, Anderson v. City of Bessemer City, N.C., supra.
The judge in this proceeding found that two main aspects of Owens's trial testimony were perjured. First, Owens's testimony as to certain things the petitioner had told him was false. Owens testified falsely that the petitioner bragged about what a great shot he had made in killing Woods. Owens also testified that the petitioner had said that Woods not only deserved to die, but that the petitioner would shoot him again. These statements indicated the petitioner felt absolutely no remorse for his crime. As the judge stated, "[T]his court is reasonably well satisfied that Owens' statements . . . were perjured." (C. 1574.)
Second, Owens lied on the stand when he directly denied receiving any favor from the State in return for his testimony against the petitioner. The court found: *Page 1257 
 "Jimmy Dale Owens' early release on probation was done entirely on the initiative of then-Sheriff Dan Ligon in a private conversation with the Judge. . . . With the exception of Weatherford's and Ferris' denials that they solicited testimony in [exchange] for a promise of lenient treatment, all of the evidence of record supports the conclusion the Jimmy Dale Owens testified against Hamilton in exchange for a recommendation from law enforcement officials the Owens would be released from jail early."
(C. 1579-80.)
The court based its finding that Owens's testimony was perjured upon the testimony of several witnesses. Oliver, who was Owens's cellmate, testified as to Owens's perjury, stating specifically:
 "A. He (Owens) said that, uh, he had told them (law enforcement authorities) that he would testify that Tommy [the petitioner] told him that he would shoot the son of a bitch anyway.
Pardon my language.
"Q. Referring to Lehman Wood[s] [the victim]?
 "A. Yeah. And, uh, he wasn't sorry he done it.
 "A. And, uh, he said, 'I'm going to say that Tommy said that he shot the son of a bitch and he deserved to die and he would shoot him again or something to that effect.'
 "Q. Did Mr. Owens ever make any statement to you regarding whether that testimony was true or false?
"A. Yes.
"Q. What did he tell you?
 "A. He said he made it up. He said the more — the better he could make it sound, they would help him more."
". . . .
 "Q. Now, what exactly, the best you can recall, did Owens tell you when he came back from his conversation with Ferris and Weatherford [the investigators for the state]?"
 "A. Well, first he kind of smiled. He said, 'After the trial I'll be a free man. I'm going to Georgia,' or words to that effect. And I said, 'What do you mean?' He said, 'I'm going to testify for them.'
". . . .
 "A. Well, after — you know, a few weeks after the trial and every day [Owens] would ask [investigator Weatherford], 'When are you going to turn me loose?' And they were telling him it was too early now, and, uh, because it would look funny.
". . . .
 "A. Well, [Owens] asked Weatherford on one occasion. And Weatherford told him, said, 'I didn't make the deal with you. You'll have to talk to Ferris.' "
(C. 1575-77.) (Emphasis added.)
Although William Oliver revealed Owens's fabrication, the perjury finding did not rest solely upon Oliver's testimony. Despite the testimony of both investigators that neither of them expressly offered Owens any incentive to testify, the evidence that they had in fact made a promise to exert favorable effort on Owens's behalf was overwhelming. First, the sheriff admitted that an interview with an inmate was not usually conducted at the sheriff's house, as it was in the case of Owens's interview. (R. 1043-44.) Further, the sheriff himself privately approached the sentencing judge in the petitioner's trial to request an early release for Owens. (R. 1045-46.) Owens's probation officer testified that he was not consulted about the release, and there were no proceedings in open court regarding the release, although consultation with the probation officer and open court proceedings would be normal procedure. (R. 1117-18.) Oliver's testimony regarding Owens's extreme guilt over perjuring himself and condemning the petitioner in order to procure early release is supported by Owens's suicide 15 months after the petitioner's trial. (R. 1047-48.)
Further, the Alabama Attorney General's Office conducted an investigation to locate and interview other inmates who had been incarcerated at the Lawrence County jail around the time of the petitioner's trial, and these investigators discovered and interviewed *Page 1258 
Anthony Winchester. Winchester stated in this interview that he had heard Owens state that "they ain't done what they were going to do for me" just three weeks after Owens testified against the petitioner. (R. 1067-69.) Winchester further testified that Owens mentioned that he had been affirmatively offered a deal and that he did not believe that "they" were going to uphold their end of the bargain. (R. 1067-69.) The Attorney General's investigator, Hollis Gandy, also testified to these statements. (R. 1155-56.)
Based on the above testimony, all of which supports Oliver's testimony, this court affirms the judgment of the trial court finding that Owens's testimony was perjured. Ample evidence exists to support the court's finding; thus, that finding was neither clearly erroneous nor palpably wrong and must be affirmed.
 B
The next issue before this court is whether the judge committed reversible error by remanding this cause for a new sentencing hearing rather than remanding it for a new trial on the merits.
The standard for granting a motion for a new trial alleging perjured testimony in a capital case is set out in Ex parteFrazier, 562 So.2d 560, 570 (Ala. 1989):
 "[T]he trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; and 3) that the movant is not relying on evidence of which he was aware at trial and which he consciously decided not to use to challenge the testimony of the perjured witness."
(Emphasis added.) The court found that no significant chance existed that had the jury heard the truth a different outcome would have resulted at the guilt phase of the trial; thus it refused to grant a new trial. This conclusion conflicts with the fact that Owens's perjured testimony depicted the petitioner as a vicious, remorseless criminal who murdered and robbed Woods. Further, had the jury known of the leniency Owens received in exchange for his testimony, they could have factored his personal interest into the weight they afforded his testimony.
In its order, the court concluded that:
 "[T]here is a significant chance that the perjury did affect the sentencing recommendation of the jury. The jury recommended death by 10-2; the absolute minimum allowed by law. If the vote of only one juror was affected by the perjured testimony of such mean, vicious, remorseless, cold, defiant and vindictive statements by Hamilton, then Hamilton was sentenced to death by virtue of such perjury. [The sentencing judge] has testified that he gave due consideration to the jury's recommendation. Obviously, such statements by Hamilton would have affected all the jurors in their sentencing recommendation. Such statements would also have directly affected [the sentencing judge's] decision, even if, somehow, miraculously, they had not affected the jury's."
(C. 1584-85.)
Based on his findings, the judge granted the petitioner a new sentencing hearing only. However, granting a new sentencing hearing is not an appropriate remedy given the findings made by the judge. The court found that the trial of Tommy Hamilton entertained perjured testimony and that the State withheld exculpatory evidence. In addition, the court found that prosecutorial misconduct and ineffective assistance of counsel were factors in this trial. Given these findings, it is impossible to imagine that the petitioner received a trial that satisfied the minimum constitutional requirements for a fair trial as contemplated by and guaranteed under the United States and the Alabama Constitutions.
The circumstances of this case closely parallel the circumstances in Giglio v. United States, 405 U.S. 150,92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In Giglio, after the jury trial, defense counsel discovered new evidence that an assistant United States attorney had promised the prosecution's principal witness immunity from indictment if he testified against Giglio at trial. The witness, however, *Page 1259 
denied any promise of leniency while on the stand. TheGiglio court, following the mandates of previous Supreme Court cases Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173,3 L.Ed.2d 1217 (1959) and Brady v. Maryland, emphatically stated that"[a] new trial is required 'if the false testimony could . . .in any reasonable likelihood have affected the judgment of thejury. . . .' " 405 U.S. at 154, 92 S.Ct. at 766 (quotingNapue, 360 U.S. at 271, 79 S.Ct. at 1178). (Emphasis added.) Further, the Court stated that ". . . whether the nondisclosure[of perjured testimony or of exculpatory evidence] was a resultof negligence or design, it is the responsibility of theprosecutor." 405 U.S. at 154, 92 S.Ct. at 766.
Clearly then the proper remedy, given the finding that a witness perjured himself during the guilt phase of the trial and that the perjured testimony was prejudicial to the defendant, is to remand the case for a new trial. Granting a new sentencing hearing is not a sufficient remedy for the violations of the petitioner's due process rights as guaranteed by the Fifth Amendment of the United States Constitution, in light of the fact that the petitioner's conviction was procured by illegal means. As the United States Supreme Court said inNapue:
 "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."
Napue, 360 U.S. at 269, 79 S.Ct. at 1177. Accord, Kilpatrick v.State, 602 So.2d 465 (Ala.Crim.App. 1992); Kuenzel v. State,577 So.2d 474 (Ala.Crim.App. 1990), affirmed, 577 So.2d 531
(Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991); Ex parte Womack, 541 So.2d 47 (Ala. 1988).
In the present case, the lower court correctly found that the State's principal witness had perjured himself. However, the court also found that the perjured testimony did not affect the guilt phase of the trial and erroneously ruled that the petitioner was entitled only to a new sentencing hearing. This court holds that the perjured testimony tainted the petitioner's conviction; therefore, the petitioner is entitled to a new trial.
 II
The petitioner further asserts that the prosecution committed a Brady violation by not disclosing to the defense that a promise of early release was bestowed upon Jimmy Dale Owens in exchange for his testimony against the petitioner. In his opinion, the judge found that the State had in fact committed aBrady violation.
 "The investigators' denial that they 'promised' Owens anything is merely playing with words. It is this Court's firm conclusion from all the above facts that Owens was told in effect by investigator Ferris, 'I can't promise you anything, but if you'll help us, I'll see what I can do.' Or, 'I'll tell the Sheriff or Judge you helped us, but I can't promise you anything.' Such word games are intolerable [at any] time, much less when a man's, even a murderer's, life is being decided. Owens may not have been promised anything specific in terms of results, but he was promised their efforts. This is conclusively shown by the testimony and the early release of Owens. As a result, Owens perjured himself by embellishing upon his conversation with Hamilton."
(C. 1584.)
The United States Supreme Court has held that suppression of exculpatory evidence by the prosecutor is a denial of due process. Brady v. Maryland. The Brady Court stated as follows:
 "The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
Brady, 373 U.S. at 87, 83 S.Ct. at 1196-97. (Emphasis added.) Therefore, regardless of whether the investigators disclosed to the prosecution their promise to Owens, the prosecution's failure to disclose that promise to the defense remains the fundamental issue; the inadvertence of that failure by the prosecutor is irrelevant in considering whether *Page 1260 
a violation occurred. Giglio v. United States.
To prove a Brady violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence was of a character favorable to the defense, and (3) that the evidence was material. Ex parte Cammon, 578 So.2d 1089, 1091
(Ala. 1991); Ex parte Brown, 548 So.2d 993, 994 (Ala. 1989).
The trial court expressly found that the prosecution suppressed the evidence of Owens's exchange of testimony for leniency. Further, evidence of this nature, which shows the possible interest of a witness in testifying falsely for his own gain is, as noted in Napue and in United States v. Bagley,473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), highly probative. As the Bagley Court found:
 "Impeachment evidence . . . as well as exculpatory evidence, falls within the Brady rule. See, Giglio v. United States, 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972). Such evidence is 'evidence favorable to an accused,' Brady 373 U.S., at 87 [83 S.Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. Cf. Napue."
473 U.S. at 676, 105 S.Ct. at 3380.
In the present case, this important evidence was suppressed. As the lower court stated in its opinion:
 "At no time did the District Attorney advise Tommy Hamilton's trial counsel of the fact that Jimmy Dale Owens had been led to believe he would receive favorable treatment in exchange for his testimony. The District Attorney had no knowledge of the inducements offered Owens. However, the investigators did. While the District Attorney was unaware of this, it matters not that the suppression was inadvertent. Jefferson v. State, [645 So.2d 313 (Ala.Crim.App. 1994)]."
(C. 1583-84.) (Emphasis added.)
Finally, in order to find reversible error, the reviewing court must consider whether the evidence that was suppressed is "material." The United States Supreme Court, inBagley, defined "material" in relation to the disclosure of evidence. The Court stated:
 "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."
473 U.S. at 682, 105 S.Ct. at 3383. See also United States v.Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976);Jefferson v. State, 645 So.2d 313 (Ala.Crim.App. 1994).
The most damaging evidence presented against the petitioner was the testimony of the trusty, Jimmy Dale Owens, who had a compelling reason to lie. His testimony was the link between the murder and the robbery, and he falsely stated that the petitioner felt no remorse for his crime and that the petitioner was even proud of himself for the shooting. The most significant demonstration of the devastating effect of Owens's testimony is indicated by the fact that he did not testify at the trial of the petitioner's codefendant/sister, Janice Glasco, and she was convicted of the lesser offense of manslaughter and sentenced to ten years' imprisonment. This fact underscores the materiality of the suppressed evidence.
As Justice Marshall stated in Bagley:
 " 'The purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one.' Application of Kapatos, 208 F. Supp. 883, 888 (SDNY1962); see Giles v. Maryland, 386 U.S. 66, 98, 87 S.Ct. 793 [, 809, 17 L.Ed.2d 737] (1967) (Fortas, J., concurring in judgment) ('The State's obligation is not to convict, but to see that, so far as possible, truth emerges'). . . . [T]he existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty. . . . When the State does not disclose information in its possession that might reasonably be considered favorable to the defense, it precludes the trier of fact from gaining access to such information and thereby *Page 1261 undermines the reliability of the verdict. . . . This proposition is not new. We have long recognized that, within the limit of the state's ability to identify so-called exculpatory information, the state's concern for a fair verdict precludes it from withholding from the defense evidence favorable to the defendant's case in the prosecutor's files."
Bagley, 473 U.S. at 692-93, 105 S.Ct. at 3389. (Justice Marshall, dissenting.) (Emphasis added.)
Having determined that the undisclosed evidence was material, we cannot apply the harmless error analysis to the facts of this case. Bagley, supra; Chapman v. California, 386 U.S. 18,87 S.Ct. 824, 17 L.Ed.2d 705 (1967). This cause must be remanded for a new trial on the merits.
Because we remand for a new trial, this court will not discuss the other contentions in the petitioner's brief, i.e., that the judge erred in not granting a new trial based upon the fact that the lead trial counsel was ineffective and that the petitioner's death sentence is disproportionately severe compared to those sentences of his accomplices. Those issues are either remedied by the granting of the motion for a new trial on the merits of the case, or they are rendered moot because those issues will not likely arise again in the second trial.
For the foregoing reasons, this court finds that the petitioner in this case, Tommy Hamilton, did not receive a fair trial as guaranteed by both the United States and Alabama Constitutions. A new trial is the required remedy. Therefore, we reverse the lower court's denial of the petitioner's motion for a new trial. The judgment of conviction is reversed and this case is remanded for further proceeding on the merits.
OPINION WITHDRAWN; OPINION SUBSTITUTED; APPLICATION OVERRULED; RULE 39(k) MOTION GRANTED; REVERSED AND REMANDED.
All the Judges concur.