BURKE, Judge.
William John Ziegler was convicted of murder made capital because it was committed during the course of a kidnapping, a violation of § 18A-5-40(a)(1), Ma.Code 1975. By a vote of 11-1, the jury recommended that Ziegler be sentenced to death. The trial court accepted that recommendation and sentenced Ziegler to death. This Court ultimately affirmed Ziegler’s conviction and sentence in Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003). On November 2, 2005, Ziegler filed a petition for posteonviction relief pursuant to Rule 32, Ala. R.Crim. P., in which he challenged his conviction and resulting death sentence. Ziegler amended his petition three times. Ziegler’s fourth and final amended petition was filed on June 15, 2010. The circuit court summarily dismissed several of Ziegler’s claims but held an evidentiary hearing to address the remainder. After a lengthy hearing, the circuit court held, for various reasons, that “Ziegler’s constitutional guarantees were not fulfilled.” (C. 609.) The circuit court granted Ziegler’s petition and held that Ziegler was entitled to a new trial. The State now appeals.
The facts underlying Ziegler’s conviction were set out in great detail in Ziegler v. State, 886 So.2d at 130-39. However, a brief summary of the evidence will be helpful for a clear understanding of the proceedings below.
Ziegler and three other individuals— William Randall, James Bennett, and Patricia Davis — were arrested and ultimately *100 indicted for the capital murder of Russell Allen Baker. The State presented evidence indicating that several people including Baker, Bennett, Davis, and Randall gathered at Ziegler’s apartment on the evening of February 19, 2000. At some point during the evening, Bennett, Randall, and Ziegler began severely beating Baker. Davis also joined in on the beating and hit Baker with a golf club. At some point after the beating stopped, Bennett, Randall, and Ziegler walked Baker out of the apartment in the direction of a wooded area near the complex.
At Ziegler’s trial, Randall testified that he, Bennett, and Ziegler walked Baker down a dirt road behind the apartment complex. Randall testified that he stabbed Baker as they were walking and that Ziegler then ordered Baker to go into the woods with them. According to Randall, Ziegler then stabbed Baker in the head and chest. Randall then walked out of the woods and Bennett took his place. A few minutes later, Randall testified that Bennett and Ziegler emerged and that Ziegler told Randall to finish Baker. Randall stated that, when he refused, Ziegler went back into the woods, then returned and announced that he had cut Baker’s throat. Baker’s body was discovered in that wooded area four days later, on February 28, 2000. He had suffered multiple stab wounds and his throat had been cut.
During the ensuing investigation, the three men gave conflicting stories about the events leading up to Baker’s death. Bennett led police to Baker’s body but denied any involvement in beating or killing him, instead, implicating Randall and Ziegler. Randall admitted hitting and kicking Baker but told police that Bennett was responsible for the murder. Ziegler implicated Bennett and Randall. At Ziegler’s trial, Vicki Bosarge testified that Ziegler attended a party at her home on the night before Baker was killed. According to Bosarge, Ziegler threatened Baker by calling him “a walking dead man.” (Rl. 205-06.)[1]
Ziegler, Bennett, Randall, and Davis were ultimately arrested and indicted for intentional murder. The intentional-murder charges were later upgraded to capital-murder. Bennett pleaded guilty to felony murder and was sentenced to 20 years’ imprisonment; Randall pleaded guilty to intentional murder and was sentenced to life imprisonment; and Davis pleaded guilty to manslaughter and was sentenced to three years’ imprisonment. (C. 402.)
In his petition, Ziegler alleged numerous grounds for relief. The issues addressed at the evidentiary hearing covered three types of allegations: that the State had violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing certain evidence; that Ziegler had received ineffective assistance of both trial and appellate counsel; and that two jurors had engaged in misconduct by failing to honestly answer questions during voir dire. In its order, the circuit court found that Ziegler proved those claims by a preponderance of the evidence and was therefore entitled to relief under Rule 32, Ala. R.Crim. P.

Standard of Review

In a postconviction proceeding under Rule 32, Ala. R.Crim. P., “[t]he petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.” Rule 32.3, Ala. *101 R.Crim. P. “The standard of review this Court uses in evaluating the rulings made by the trial court is whether the trial court abused its discretion.” Hunt v. State, 940 So.2d 1041, 1049 (Ala.Crim.App.2005), citing Elliott v. State, 601 So.2d 1118, 1119 (Ala.Crim.App.1992). “A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based his decision.” Hodges v. State, 926 So.2d 1060, 1072 (Ala.Crim.App.2005) (internal citations omitted). However, “[w]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court’s review in a Rule 32 proceeding is de novo.” Ex parte White, 792 So.2d 1097, 1098 (Ala.2001).
“When conflicting evidence is presented, however, a presumption of correctness is applied to the court’s factual determinations, and they will not be disturbed unless they are clearly erroneous.” State v. Hamlet, 913 So.2d 493, 497 (Ala.Crim.App.2005). We note that the judge who presided over Ziegler’s Rule 32 proceedings was not the same judge who presided over Ziegler’s trial and sentencing.
I.
In his petition, Ziegler alleged that he received ineffective assistance of counsel throughout the proceedings against him. The circuit court found that Ziegler’s counsel were ineffective in all phases of Ziegler’s trial and on appeal.
First, Ziegler alleged that he suffered a constructive denial of counsel when his court-appointed attorney provided no representation or assistance between March 16, 2000, and October 30, 2000. According to Ziegler, Habib Yazdi was appointed to represent him on or about February 25, 2000. Ziegler alleged that Yazdi represented him at his arraignment on March 2, 2000, and that Yazdi attended a preliminary hearing on Ziegler’s behalf on March 16, 2000.
However, at the March 16, 2000, hearing, another attorney, Donald Fried-lander, appeared on Ziegler’s behalf and questioned the only witness at the hearing. According to Ziegler, Friedlander never intended to continue representing Ziegler and appeared at the preliminary hearing only as a favor to Ziegler’s family. Ziegler claimed that Yazdi never took any steps to determine whether Friedlander would continue to represent Ziegler after the hearing; that Yazdi never obtained an order relieving him as appointed counsel; and that Yazdi took no steps after March 16, 2000, to represent Ziegler in connection with the intentional-murder charge. Ziegler alleged that Yazdi took “no steps to investigate the crime, no steps to prepare a defense for Ziegler, and no steps to negotiate with the State or otherwise to advocate for his client until October 30, 2000, when Yazdi appeared to represent Ziegler at the arraignment on the upgraded charge of capital murder.” (C. 748.)
‘When reviewing claims of ineffective assistance of counsel, we apply the standard adopted by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on a claim of ineffective assistance of counsel a petitioner must show: (1) that counsel’s performance was deficient; and (2) that the petitioner was prejudiced by the deficient performance.
“ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude *102 that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” See Michel v. Louisiana, [350 U.S. 91] at 101 [ (1955) ]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
“Strickland v. Washington, 466 U.S. at 689, 104 S.Ct. 2052.
“ ‘ “ ‘This court must avoid using “hindsight” to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.’ ” Lawhorn v. State, 756 So.2d 971, 979 (Ala.Crim.App.1999), quoting Hallford v. State, 629 So.2d 6, 9 (Ala.Crim.App. 1992). “[A] court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052.’
“A.G v. State, 989 So.2d 1167, 1171 (Ala. Crim.App.2007).”
Lee v. State, 44 So.3d 1145, 1154-55 (Ala.Crim.App.2009).
At the evidentiary hearing, Ziegler presented testimony from both Yazdi and Friedlander. Yazdi confirmed that he was appointed to represent Ziegler on February 25, 2000. However, Yazdi testified that, when he appeared in court for Ziegler’s preliminary hearing on March 16, 2000, he saw Friedlander and assumed that Friedlander had been retained to represent Ziegler. Yazdi stated: “But I have gone there and I noticed Mr. Friedlander was hired [so] I left.” (R. 103.) However, Yazdi also testified that he could not remember if Friedlander informed him that he would be representing Ziegler going forward.
Yazdi also admitted that he did not file a motion to withdraw as Ziegler’s attorney. Yazdi stated:
“No, sir, we don’t [file motions to withdraw]. When a new attorney comes he takes over, hopefully, he does a notice of appearance. A lot of them don’t do, but I just leave and I go. That was the end of my case with [Ziegler].”
(R. 103.) Yazdi stated that he did not know whether Friedlander filed a notice of appearance because, Yazdi said, “I didn’t follow that case anymore. I have other cases.” (R. 104.)
Yazdi continued to explain why he did not file a motion to withdraw from Ziegler’s case:
“We don’t want to bill the government for every nonsense. That’s why, otherwise, I could make a motion to withdraw and spend an hour on it and the government pay me 85 bucks. We don’t do that. If he has another attorney, goodbye. So what’s the motion to withdraw good for?”
*103 (R. 105.) However, Yazdi admitted that he had, in the past, filed motions to withdraw. In fact, Ziegler offered into evidence a motion to withdraw that Yazdi had filed in an unrelated case in Mobile County. See (Petitioner’s Exhibit 513.) The evidence further demonstrated that, despite never formally withdrawing from the case, Yazdi closed his file on Ziegler’s case on March 16, 2000.
Donald Friedlander testified that he was never appointed to represent Ziegler, nor did he file a notice of appearance in Ziegler’s case. Rather, Friedlander stated that he knew Ziegler’s family and, based on that relationship, appeared on Ziegler’s behalf at the preliminary hearing in March of 2000. Friedlander stated that Yazdi was present in court that day. Friedlan-der also testified that he informed Yazdi that he would not be continuing to represent Ziegler going forward. (R. 480.) However, Friedlander did not remember whether Yazdi responded.
Further testimony and evidence would reveal that neither Friedlander nor Yazdi did any work on Ziegler’s case between the March 16, 2000, hearing and Ziegler’s arraignment on capital-murder charges on October 30, 2000. When asked whether he did any work during that period, Yazdi would only reply, “I was not his lawyer anymore.” (R. 117.)
In its order granting Ziegler’s petition, the circuit court found that Ziegler was unrepresented between March 16, 2000, and October 30, 2000. That finding is amply supported by evidence presented at the Rule 32 hearing. In its brief on appeal, the State concedes that Ziegler was without counsel between March 16, 2000, and October 30, 2000. See State’s brief, at 38 (“For an eight-month period between his March 16, 2000, preliminary hearing and October 30, 2000, arraignment, Ziegler was effectively unrepresented by counsel.”).
However, the State argues that Yazdi’s assumption that Friedlander had been hired to represent Ziegler and Yaz-di’s failure to take the appropriate steps to withdraw from the case were reasonable decisions. Therefore, the State argues, Yazdi’s performance was not deficient under the first prong of Strickland. However, the State cites no authority for that proposition. Instead, the State relies heavily on Yazdi’s testimony that it was “the custom of our court” not to file motions to withdraw. (R. 104.)
Notwithstanding any customary practices at the trial-court level, Rule 6.2(b), Ala. R.Crim. P., provides:
“Counsel representing a defendant at any stage shall continue to represent that defendant in all further proceedings in the trial court, including filing of notice of appeal, unless counsel withdraws in accordance with a limited contract of employment as described in Rule 6.2(a), or for other good cause as approved by the court.”
In Esters v. State, 894 So.2d 755 (Ala. Crim.App.2003), the appellant was appointed counsel but subsequently retained a different attorney. This Court held that “[a]lthough counsel, retained by Esters’s family, filed a motion to withdraw Esters’s guilty pleas, both appointed trial counsel were still attorneys of record. Their representation of, and attendant obligations to, Esters existed as long as they remained attorneys of record.” Id. at 761. This Court further held that appointed counsel’s responsibilities continued until he was allowed to withdraw from the case. Id. Thus, even if Friedlander had been retained by Ziegler’s family and affirmatively told Yazdi that he would continue to represent Ziegler going forward, Yazdi *104 still would have had a duty to formally withdraw from Ziegler’s case.
In the present case, it is undisputed that Yazdi never formally withdrew as Ziegler’s counsel. This Court is aware of no rule or holding that would allow an appointed attorney to abandon his client based on his mere assumption that another attorney had been retained. Rather, counsel has a duty to represent his client until the trial court allows him to withdraw from the case. Failure to do so cannot be excused by counsel’s assumptions, nor can it be obviated by local customs.
Even if customary practices could excuse Yazdi’s neglect, the circuit court, as the finder of fact, could have determined that there was no such custom. As noted, “a presumption of correctness is applied to the court’s factual determinations, and they will not be disturbed unless they are clearly erroneous.” State v. Hamlet, 913 So.2d at 497. Based on Rule 6.2(b), Ala.R.Crim. P., in finding that counsel’s failure to formally withdraw from a case was not the “custom of [the] court,” the circuit court would not have abused its discretion.
Yazdi’s inaction resulted in Ziegler’s being effectively unrepresented for almost eight months. Accordingly, we hold that the circuit court did not abuse its discretion in finding that Yazdi rendered deficient performance under the first prong of Strickland by failing to withdraw from the case or to take any actions to represent Ziegler’s interests between March 16, 2000, and October 30, 2000. As discussed below, that period was critical to Ziegler’s defense.
The second prong of Strickland requires a showing that counsel’s deficient performance prejudiced the defendant. In Strickland, the United States Supreme Court held that “[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice.” 466 U.S. at 692. Thus, a detailed showing of how Ziegler was prejudiced is not required. Nevertheless, the circuit court detailed the prejudice that Ziegler suffered as a result of his deprivation of counsel.
In its order, the circuit court held that Ziegler was constructively deprived of counsel during a “critical stage of the proceedings against [him].” (C. 555), citing Powell v. Alabama, 287 U.S. 45, 57, 53 S.Ct. 55, 77 L.Ed. 158 (1932)(noting that “the time of ... arraignment until the beginning of ... trial” is “perhaps the most critical period of the proceedings,” a period “when consultation, thorough-going investigation and preparation are vitally important” and the defendant is “as much entitled to such aid during the period as the trial itself’); Spano v. New York, 360 U.S. 315, 325-26, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (Douglas, J., concurring) (“[T]he right to counsel extends to the preparation for trial, as well as the trial itself.... When [a defendant] is deprived of that right after indictment and before trial, he may be denied effective representation of counsel at the only stage when legal aid and advice would help him.”).
However, the circuit court stated that it need not decide whether a constructive denial of counsel was presumptively prejudicial in Ziegler’s case because, it held, “the evidence is overwhelming that Ziegler suffered vast prejudice as a result of the failure of trial counsel to conduct an adequate investigation.” (C. 556.) The circuit court further held:
“Here, the lack of representation suffered by Ziegler not only included the failings of trial counsel during the period after Ziegler’s arraignment [for capital murder], but also during the eight-month period of deprivation, and the evidence establishes that Ziegler suf *105 fered prejudice under Strickland as a result of both failings, whether considered individually or collectively.”
(C. 556.) These findings are supported by the evidence presented at the evidentiary hearing as discussed below.
Testimony from several witnesses at Ziegler’s Rule 32 hearing tended to refute the State’s contention at trial that Baker had been killed in the same location where his body had been found. Several police officers and expert witnesses testified that they believed Baker had been killed in a different location and that his body had been dumped in the woods. In its order, the circuit court held:
“One stark example of the prejudice suffered by Ziegler by virtue of the lack of representation for eight months can be seen with respect to the evidence relating to Baker’s body at the scene. The [American Bar Association (‘ABA’) ] Guidelines [for the Appointment and Performance of Defense Counsel in Death Penalty Cases] make clear that ‘counsel should attempt to view the scene of the alleged offense. This should be done under circumstances as similar as possible to those existing at the time of the alleged incident (e.g., weather, time of day, and lighting conditions).’ ABA Guidelines, Guideline 11.4.1(D)(6). However, in Ziegler’s case, the investigation of the scene occurred ‘10 months after the incident’ and, by then, ‘[i]t was overgrown, the whole place had changed.’ [ (R. 230.) ] Additionally, no investigation was undertaken concerning Bennett’s car during this pre-trial period, During this eight-month period, the interior of Bennett’s car was destroyed. [ (R. 725-26.) ] As a result, evidence of the blood soaked interior of Bennett’s car was lost. (Id.) Additionally, no counsel was interviewing witnesses or gathering facts of any kind to prepare a defense to the charges facing Ziegler. These failings, as well as the failures of counsel after Ziegler’s arraignment left Ziegler on trial for his life with no defense against those charges. As discussed previously, a proper investigation would have uncovered significant facts that would have enabled the defense to mount a vigorous defense to the charges faced by Ziegler. In light of the available evidence that could have been discovered, had Ziegler received representation by counsel during this period, there is a reasonable probability of a different result, and prejudice has been established.
“The lack of representation also prejudiced Ziegler in other ways, as during this eight-month period no one was attempting to persuade the prosecution not to elevate the charges to capital murder. The ABA Guidelines establish that even before the prosecution announces an intention to charge the defendant with a capital offense, counsel should ‘employ[ ] strategies to have the case designated by the prosecution as a non-capital case.’ ABA Guidelines, Guideline 11.3. Had counsel actually been representing Ziegler, there is a reasonable probability that counsel could have convinced the prosecution not to elevate the charges to capital, particularly when the lead ' prosecutor publicly stated in August 2000 that ‘[i]n this case, there are no criteria under the facts as we have them that could establish capital murder.’ [Petitioner’s Exhibit 181].”
(C. 556-57.) Because these findings are supported by the record, we do not conclude that the circuit court abused its discretion in determining that Ziegler was prejudiced by the failure of counsel to represent him between March 16, 2000, and October 30, 2000.
*106 In its brief on appeal, the State falls short of conceding that Ziegler was prejudiced. See State’s brief, at 38 (“If Ziegler was prejudiced by this lack of representation, such prejudice is only the second prong of the Strickland test. As Ziegler has failed to show that counsel’s actions were unreasonable, any prejudice he suffered cannot be attributed to ineffective counsel.”). However, the State offers no arguments suggesting that Ziegler was not prejudiced by a lack of representation.
In fact, the State indirectly references this eight-month period in a later argument in its brief. For example, in arguing that Ziegler’s counsel conducted an adequate investigation after Ziegler was arraigned for capital murder, the State contends that counsel’s “investigation was constitutionally sufficient, given the circumstances as they existed when counsel were brought onto the case.” (State’s brief, at 44.) Similarly, the State argues that Gary Cohen, an investigator hired by Ziegler’s counsel, conducted a reasonable investigation. The State asserts: “Considering that he was not formally brought onto the case until December 2000, Cohen did the best he could with the evidence available. The location where Baker’s body was found had changed, and Cohen could locate no evidence at the scene.” (State’s brief, at 46.) See also State’s brief, at 46 (“When Cohen was able to locate Bennett’s car, he found the interior stripped and therefore useless from a forensic standpoint.”). These arguments illustrate the prejudice Ziegler suffered as a result of not being represented for that period.
Accordingly, we hold that the circuit court did not abuse its discretion in finding that Yazdi’s failure to represent Ziegler between March 16, 2000, and October 30, 2000, constituted deficient performance, nor did it abuse its discretion in determining that Ziegler was prejudiced as a result. Based on those findings, the circuit court was correct in holding that Ziegler was denied the effective assistance of counsel under Strickland v. Washington and that Ziegler was entitled to a new trial.
II.
Next, Ziegler raised several claims alleging that the State had violated Brady v. Maryland, by suppressing material, exculpatory, and impeachment evidence from the defense. Specifically, Ziegler pointed to Vicki Bosarge’s testimony regarding the threat she heard Ziegler make to Baker the night before he was killed. According to Ziegler, Bosarge informed law enforcement before and after trial that she did not know Ziegler. Additionally, Ziegler claimed that the State was aware of other witnesses who had stated that Ziegler was not present at Bosarge’s house the night before Baker was killed but that the State did not disclose this information to the defense.
Ziegler also claimed that the State suppressed evidence indicating that Bennett’s vehicle was used in connection with the murder, a fact Ziegler claimed would have been inconsistent with the State’s theory of the case. The circuit court found that Ziegler proved these claims at his eviden-tiary hearing by a preponderance of the evidence.
In order to obtain relief on a Brady claim, Ziegler was required to prove “(1) that the prosecution suppressed evidence ... (2) that the evidence was of a character favorable to his defense, and (3) that the evidence was material.” Hamilton v. State, 677 So.2d 1254, 1260 (Ala.Crim.App.1995). “Evidence is material only if there is, a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable *107 probability’ is a probability sufficient to undermine confidence in the outcome.” Id., quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). As to the materiality requirement of Brady, the United States Supreme Court has held:
“Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant’s acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) .... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.”
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(internal citations omitted).
Additionally, “ ‘[i]mpeachment evidence ... as well as exculpatory evidence, falls within the Brady rule.’ ” Hamilton, 677 So.2d at 1260, quoting Bagley, 473 U.S. at 676. Furthermore, Brady material need not be within the possession or control of the prosecution. See Duncan v. State, 575 So.2d 1198, 1203 (Ala.Crim.App.1990)(“Whether the prosecutor knew of the existence of the [evidence], the knowledge of the law enforcement agents is imputed to the prosecutor.”).
In the present case, the circuit court found that the trial court “entered an ‘open file’ order that required the prosecution to provide the defense with all materials relating to the prosecution of Ziegler.” (C. 403.) The circuit court went on to find that the State offered testimony that it knew or should have known was false.
At Ziegler’s trial, Vicki Bosarge testified that Ziegler and Bennett were at her home the evening before Baker was killed. According to her trial testimony, Ziegler threatened Baker by calling him “a walking dead man.” (Rl. 205-06.) This Court noted that Bosarge’s “testimony provide[d] evidence of Ziegler’s intent.” Ziegler, 886 So.2d at 143.
At Ziegler’s Rule 32 hearing, Bosarge recanted her testimony. Bosarge explained that she had been confused about who she was testifying against because Ziegler and Randall are both named William. Bosarge testified that law-enforcement officers “kept saying Will and Willy, Will and Willy, Will and Willy, Will and Willy. I mean I’m going who is Will and who is Willy and what are you talking about, I don’t even know what you’re talking about.” (R. 50.) Bosarge also stated that she felt pressured to testify because law-enforcement officers kept showing her pictures of Baker’s body. Additionally, Bosarge stated she was afraid that, if she did not cooperate with law enforcement, her 12-year-old daughter might be taken away from her. Bosarge explained that her daughter was pregnant at the time and had believed that Baker was the father.
Bosarge then testified that Ziegler was not at her home the night before the murder and that she did not know Ziegler. Bosarge stated that immediately after she testified at Ziegler’s trial, she spoke with a law-enforcement officer and informed him that her testimony was false. Bosarge stated that she told the officer, “that wasn’t him, that’s not him.” (R. 55.) According to Bosarge, the officer told her that she “did the right thing.” (R. 55.)
*108 Bosarge was also asked whether she told law enforcement, before trial, that she did not know Ziegler. At the Rule 82 hearing, the following exchange took place:
“[Ziegler’s counsel]: Did you ever tell law enforcement you didn’t know who Ziegler was?
“[Bosarge]: Yes, I said I don’t know who Will and Willy is and Will, Willy, Will, Willy, Will, Willy, I don’t know who these people are, what are you talking about. I didn’t know which one was which. I was never showed pictures by those people, who’s Will, who’s Willy and who’s William, I don’t know who these people are.
“The only person that I know is Jay Bennett. I knew him, I mean because of him always beating up Allen [Baker] and acting — you know. And the light-skinned man with the dark hair, I don’t know. I’m sorry but I don’t know who—
“[Ziegler’s counsel]: You don’t know who that was?
“[Bosarge]: Who he is.
“[Ziegler’s counsel]: What you can say, for sure, it’s not Ziegler that you’re looking at right now?
“[Bosarge]: He’s not light-skinned and he’s not little.
“[Ziegler’s counsel]: You’re saying Ziegler is dark-skinned and shorter than the man was?
“[Bosarge]: William Ziegler is stocky, round face, dark hair and dark.
“[Ziegler’s counsel]: That was not the man in [your home the night before Baker was killed]?
“[Bosarge]: No.”
(R. 80.)
In its order, the circuit court found that the occurrence of Bosarge’s meetings with law enforcement was corroborated through interview-request forms prepared by the district attorney in preparation for Ziegler’s trial. Those exhibits indicated that investigators for the State were asked to ' speak with Bosarge on at least two occasions. See Petitioner’s Exhibits 410, 411.[2] The circuit court further found that Bo-sarge’s testimony was corroborated by two additional witnesses, Margaret Roberson and Bosarge’s son, Ricky Melton. Both witnesses testified that they were at Bo-sarge’s house the night before Baker was killed. Melton specifically testified that he told the police that Ziegler was not present at Bosarge’s house that night. Melton also stated that the officer who was questioning him was taking notes. See R. 91-92. Similarly, Roberson testified that she was friends with Ziegler at the time and that Ziegler was not at Bosarge’s house the night before the murder. See R. 386.
The circuit court’s order stated:
“After observing Roberson’s demeanor and testimony, the Court finds Roberson’s testimony credible and worthy of belief particularly in light of the fact that Roberson has no relationship with Bosarge, her son or Ziegler’s family.
“Having observed Bosarge’s demean- or and testimony, the Court finds her testimony credible and worthy of belief. The Court finds Bosarge had no motivation or incentive to come to the Rule 32 hearing and essentially recant her trial testimony. Further, her testimony was corroborated by Roberson, an unrelated and uninvolved witness. The testimony *109 from these witnesses clearly establishes that Ziegler was not present at the Bo-sarge house on February 18, 2000 and Bosarge’s testimony at Ziegler’s trial was false.”
(C. 408.) The circuit court also noted that Baker’s mother, Karen Lee, rebutted Bo-sarge’s testimony regarding Ziegler’s presence at her house. However, the circuit court stated:
“Unlike Bosarge, Lee has significant motivation and incentive to give testimony that would negatively affect [the] Rule 82 hearing for the man that has been convicted for her son’s- murder. Based on the witnesses’ actions and demeanor the Court finds Bosarge’s testimony more credible.”
(C. 408.)
The circuit court went on to find that defense counsel never received the information that Ziegler was not present at Bosarge’s house the night before the murder. The court pointed to the prosecutor’s deposition testimony in which she explained that she always memorialized Brady information that she disclosed to defense counsel by sending letters to counsel that would then be copied to the court file. The circuit court found that none of the disclosure letters related to Ziegler’s trial contained information regarding the witnesses who stated that Ziegler was not at Bosarge’s house the night before the murder. Additionally, defense counsel testified that he did not recall being informed that any witnesses told law enforcement that Ziegler was not at Bosarge’s house and therefore did not threaten Baker.
Based on Bosarge’s and Melton’s testimony, the circuit court found that the State knew that Ziegler was not at Bo-sarge’s house on February 18, 2000, and that he never threatened Baker. The circuit court found that the evidence was favorable to Ziegler and that the State never disclosed it. The circuit court continued:
“Finally, although all of the suppressed evidence must be considered collectively, the Court finds that this evidence alone was clearly material. ‘There is no question that such a recantation and accusation of another would be both exculpatory and material.’ Ex parte Cammon, 578 So.2d 1089, 1091 (Ala.1991). As [defense counsel] testified, evidence that Ziegler was not at Bosarge’s house would have been important to the defense because ‘it would go to discredit the Bosarge lady’s testimony about what she heard ... plus, it would also eliminate some questions about intent. I would say it would be important in that aspect if there was no plan in place or whatever at the time of that party to do some harm to the victim.’ [ (R. 309.) ]”
(C. 511.) The circuit court also held:
“[T]he presentation of [Bosarge’s] testimony at Ziegler’s trial violated Ziegler’s due process rights under Brady and its progeny. Whether or not the individual prosecutors at Ziegler’s trial were actually aware of this fact is irrelevant, as under Brady ‘the knowledge of law enforcement agents is imputed to the prosecutor.’ Duncan[ v. State], 575 So.2d [1198] at 1203 [ (Ala.Crim.App.1990) ]; see also Martin[ v. State], 839 So.2d [665] at 670 [ (Ala.Crim.App.2001) ] (the ‘ “individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government’s behalf’ ’). This evidence was clearly favorable to the defense and was required to have been disclosed.”
(C. 510.)
In its brief on appeal, the State first argues that the circuit court erred by failing to summarily dismiss this claim as procedurally barred pursuant to Rule *110 32.2(a)(3) and (5), Ala. R.Crim. P., because, the State says, the claim could have been but was not raised at trial or on direct appeal. According to the State, Ziegler failed to present evidence at the Rule 32 hearing to overcome the State’s assertion of the procedural bars.
However, the circuit court found that Ziegler’s trial and appellate counsel “testified without contradiction or doubt that this evidence was never disclosed to the defense, and the State has never suggested that this evidence was disclosed.” (C. 511.) Based on that finding, the circuit court concluded that Ziegler proved that he could not have raised this issue at trial or on appeal.
The State’s remaining arguments regarding this issue are merely assertions that Bosarge was not a credible witness. The State points to various portions of Bosarge’s testimony that it characterizes as “bizarre.” (State’s brief, at 26.) Essentially, the State is asking this Court to discredit Bosarge and to reweigh the evidence in its favor.
However, “questions regarding weight and credibility determinations are better left to the circuit courts, ‘which [have] the opportunity to personally observe the witnesses and assess their credibility.’ ” Byrd v. State, 78 So.3d 445, 450 (Ala.Crim.App.2009) (internal citations omitted). The circuit court was in a better position than is this Court to make a determination about the demeanor and credibility of the witnesses. In fact, the court specifically noted in its order that it found Bosarge to be a credible witness. Accordingly, this Court will not disturb that finding on appeal.
As noted above, the circuit court’s findings that the State suppressed favorable and material evidence are supported by the record. Furthermore, the circuit court’s application of those findings to the law are correct. Bosarge’s testimony at Ziegler’s trial helped to prove the element of intent. If, as the circuit court found, the State suppressed the existence of witnesses who could have impeached Bo-sarge’s testimony, or if the State knew that Bosarge’s testimony was false, then defense counsel would have been able to call her testimony into question. In granting relief on this issue, the circuit court determined that there was a reasonable probability that such impeachment evidence could have undermined confidence in the outcome of Ziegler’s trial. Based on the evidence presented at the Rule 32 hearing, we do not find that the circuit court abused its discretion in determining that the State violated Brady and that Ziegler is entitled to a new trial.
III.
Finally, Ziegler claimed that two jurors engaged in misconduct by failing to answer questions truthfully during voir dire. According to Ziegler, the jurors’ false and misleading answers “interfer[ed] with his right to exercise challenges for cause and peremptory challenges.” (C. 947.)
First, Ziegler claimed that G.O., who ultimately served on Ziegler’s jury, committed misconduct during voir dire by failing to respond and by giving false and misleading answers to questions regarding the death penalty. Ziegler alleged:
“Juror G.O. did not answer truthfully when [defense counsel] asked the entire venire the fundamentally material question of whether ‘the jury expressed some opinion to anyone as to being in favor of death penalty or not?’ [ (R. 61.) ] When no venireperson responded to that question, [defense counsel] further asked whether anyone had ‘talk[ed] about [the] death penalty in their life?’ *111 [ (R. 61.) ] After the trial court instructed [defense counsel] to clarify that second question, each prospective juror was required to state individually whether he or she had ever discussed the death penalty and what opinion he or she had expressed. [ (R. 64, 66.) ]
“Juror G.O. responded only that ‘I probably discussed it sometime or another, but it would depend on the facts of the case.’ [ (R. 70.) ](emphasis added). That evasive answer failed to disclose that Juror G.O. had in fact discussed the death penalty during deliberations when he served as a juror on another capital murder case in 1995.”
(C. 948.)
This Court has held:
“ “We start with the basic constitutional premise that every person is entitled to an impartial jury [pursuant to the Sixth Amendment to the United States Constitution].’ Knight v. State, 675 So.2d 487, 493-94 (Ala.Cr.App.1995), cert. denied, 675 So.2d 502 (Ala.1996). ‘It is fundamental to our system of impartial justice that “ ‘[p]arties have a right to have questions answered truthfully by prospective jurors to enable them to exercise their discretion wisely in exercising their peremptory strikes.’ ” ’ State v. Freeman, 605 So.2d 1258, 1259 (Ala.Cr.App.1992) (quoting Ex parte O’Leary, 438 So.2d 1372, 1373 (Ala.1983), quoting in turn Ex parte O’Leary, 417 So.2d 232, 240 (Ala.1982)). ‘Voir dire’ is an ancient phrase which literally means ‘to speak the truth.’ W. LaFave & J. Israel, Criminal Procedure § 22.3(a) (2d. ed.1992). ‘ “mere the party has examined the jurors concerning their qualifications, and they do not answer truly, it is manifest that he is deprived of his right of challenge for cause, and is deceived into foregoing his right of peremptory challenge.”’ Ex parte Ledbetter, 404 So.2d 731, 733 (Ala.1981) (quoting Leach v. State, 31 Ala. App. 390, 18 So.2d 285, cert. denied, 245 Ala. 539, 18 So.2d 289 (1944)). ‘Failure to enforce the right to elicit from prospective jurors truthful answers to material questions renders hollow the right of peremptory challenge.’ Knight v. State, 675 So.2d at 494 (quoting Mitchell v. State, 458 So.2d 819, 821 (Fla.Dist.Ct.App.1984)).
“In addressing the issue whether a defendant was deprived of the right to exercise peremptory strikes based on truthful answers from prospective jurors, the Alabama Supreme Court recently reiterated the test to be ‘whether the defendant might have been prejudiced by a veniremember’s failure to make a proper response.’ Ex parte Stewart, 659 So.2d 122, 124 (Ala.1993) (emphasis added). This test casts a ‘light burden’ on the defendant. Cf. Ex parte Lasley, 505 So.2d 1263, 1264 (Ala. 1987) (stated in regard to the test of whether juror misconduct might have influenced the verdict).”
Tomlin v. State, 695 So.2d 157, 169-70 (Ala.Crim.App.1996).
In its order, the circuit court found that the evidence presented at Ziegler’s Rule 32 hearing “clearly established that Juror G.O. failed to respond truthfully to a critical line of inquiry during voir dire.” The court noted petitioner’s exhibit number 628, which indicated that G.O. had served as a juror in the capital-murder case against Vernon Madison in 1994. The circuit court also found that, had G.O. responded truthfully, defense counsel would have, at a minimum, exercised a peremptory challenge against G.O. The court based that finding on defense counsel’s testimony that he would have “absolutely” exercised *112 a peremptory strike against G.O. had he disclosed his prior jury service.
A review of the record from the Rule 32 hearing reveals that Ziegler’s defense counsel explained why he would have challenged G.O.:
“Because he’s already been down this road before. Typically, if I can do it, I’ll take off anybody that’s ever been on a jury ... but I would have taken him off at least with a peremptory challenge .... ”
(R. 290.) The circuit court stated that, based on defense counsel’s “demeanor and testimony,” it found him to be a credible witness regarding juror G.O. (C. 500.)
Based on its findings, the circuit court concluded that G.O. “[cjlearly committed misconduct by failing to respond truthfully to a critical line of inquiry during voir dire.” (C. 605-06.) The circuit court also held that Ziegler was prejudiced by G.O.’s failure to answer truthfully during voir dire.
On appeal, the State first argues that this issue was procedurally barred by Rule 32.2(a)(3) and (5), Ala. R.Crim. P., because, the State says, it could have been raised at trial or on appeal. The State contends that Ziegler offered no proof at his evidentiary hearing to indicate that the alleged misconduct could not have been discovered in time to raise it in a prior proceeding. However, defense counsel testified that he was not aware that G.O. had previously served on a jury. Similarly, Ziegler’s appellate counsel gave testimony suggesting that he was also unaware of the juror misconduct because, he said, it would not have been apparent from the record. See R. 717. Thus, Ziegler did present evidence, demonstrating that he could not have raised this issue at trial or on appeal. Accordingly, the State’s assertion is refuted by the record.
The State also argues that the circuit court abused its discretion in finding that G.O. lied during voir dire. According to the State, “there is no proof that [G.O.’s] statement was a lie — there is no evidence that he voted for death, or even that he discussed the question with the other members of the jury.” (State’s brief, at 147.) However, the evidence was clear that G.O. had served as a juror in a capital-murder trial and had engaged in deliberations. The circuit court is certainly aware that jurors in a capital case must, if they are to fulfill their duties as jurors, discuss whether to recommend the death penalty or life imprisonment without parole. There was no testimony indicating that the jury on which G.O. had previously served did not properly discharge its duties. Accordingly, it was not an abuse of discretion for the circuit court to infer that G.O. had participated in discussions regarding the death penalty during his prior jury service and that his answer during voir dire was false and misleading.
The State also appears to attack defense counsel’s credibility as a witness by noting that he was “hardly a neutral witness” and that his testimony was unsubstantiated. (State’s brief, at 148.) However, a lower court’s findings regarding a witness’s credibility as well as the weight given to that witness’s testimony are matters within its discretion and will not be disturbed on appeal unless they are clearly erroneous. In the present case, there is nothing to suggest that the circuit court’s finding that G.O. committed misconduct was improper.
The State does not appear to contest the circuit court’s conclusion that Ziegler suffered prejudice as a result of G.O.’s misconduct. Nevertheless, this Court has held that “the determination of whether a party might have been prejudiced, i.e., whether there was probable prejudice, is a matter within the trial court’s discretion.” *113 Ex parte Dobyne, 805 So.2d 763, 772 (Ala. 2001). Because the circuit court’s findings regarding the existence of juror misconduct and the resulting prejudice that ensued are supported by the record, we do not find that it abused its discretion in granting Ziegler a new trial.

Conclusion

In the present case, Ziegler also filed a cross-appeal challenging the circuit court’s summary dismissal of a claim alleging a conflict of interest regarding an attorney who represented one of Ziegler’s codefen-dants. In the section of his brief addressing this claim, Ziegler states: “Accordingly, and solely to the extent that this Court does not affirm the Circuit Court’s order granting Mr. Ziegler a new trial, Mr. Ziegler is entitled to a reversal of this portion of the Circuit Court’s September 2009 Order -” (Ziegler’s brief, at 149.) Because we are affirming the circuit court’s decision to grant Ziegler a new trial, we need not address whether summary dismissal of this claim was proper.
We note that the circuit court granted relief on numerous other grounds of ineffective assistance of counsel, Brady violations, and juror misconduct. This Court expresses no opinion on the merits of those individual issues. The State conceded at oral argument that Ziegler would be entitled to a new trial if this Court were to affirm a single ground out of the dozens on which the circuit court granted relief. We find it unnecessary to address each and every issue when the remedy for an affir-mance on any ground, i.e., a new trial, would be the same.
For the foregoing reasons, the judgment of the circuit court is affirmed.
AFFIRMED.
WELCH and JOINER, JJ„ concur. WINDOM, P.J., concurs in the result. KELLUM, J., concurs in the result, with opinion.

. “R1” denotes the trial transcript from Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003). The entire record on appeal from that case was admitted as Petitioner’s Exhibit 804 and is contained in the supplemental record on appeal in the present case.

. An index of the exhibits admitted at the Rule 32 hearing is contained in the supplemental record on appeal. Those exhibits are contained on Compact Discs that accompany the record.